## CASEY v. HOLMES, BOTT & EARLE.

1. The complainant, and defendants, were proprietors of adjacent warehouses, and wharves, to each of which was attached a steam power screw, for compressing cotton, and upon the consideration, that the complainant would allow the defendants the use of the principal part of his wharves, and abstain from receiving the wharfage on cotton landed there, the defendants agreed not to compress cotton at their screw during a period stipulated. Held, that in such a case, where one of the parties had performed his

Casey v. Holmes, Bott and Earle.

part of the contract, chancery had jurisdiction to interfere, and by injunction restrain the other party from violating it. That it was not necessary that the contract should have been actually violated; it is sufficient that the danger of its violation is imminent, and actually impending.

2. The court will not specifically enforce a contract, the terms of which are so doubtful, or ambiguous, that they cannot be understood; but where the contract has been partially executed, and one of the parties has derived a benefit from it, the court will struggle hard for its meaning, and will enforce it according to the probable intent of the parties.

3. When a written contract refers to the terms of another contract, as one of the stipulations then agreed on, proof may be made what the terms so referred to were.

4. It is only necessary to state a contract according to its terms, and legal effect, and although in a bill for specific performance, it is necessary to alledge a performance, or offer to perform, on the part of the plaintiff, it is not necessary to anticipate the defence of the defendant.

5. Bills for a specific performance, are addressed to the sound discretion of the court, and relief will not be granted, where, under all the circumstances of the case, it would be inequitable to enforce a performance, but the parties will be left to their legal remedy. Greater latitude will be allowed the defendant in resisting, than will be accorded to the plaintiff in making out his case.

6. To entitle one of the parties to a contract, to defend himself by proving a violation of it by the other, he must act promptly. He cannot afterwards take the benefits the contract conferred on him, and then refuse to perform it, as to the benefits conferred on the other contracting party.

Appeal from the Chancery Court at Mobile.

The bill was filed by the appellant, and alledges, that he is the owner and occupier of a cotton press, in the city of Mobile, known as the "Independent Press," and of the wharves and warehouses thereto attached, and was engaged in the business of compressing, and storing cotton—that there was a certain other cotton press in the city, with large warehouses and wharves thereto attached, known as Hitchcock's Press, situate contiguous to the press of appellant. That sometime in the spring or summer of 1845, appellant had made an arrangement with the owners of Hitchcock's press, for the lease thereof at a stipulated rent. Subsequent to this an agreement was entered into, between appellant and the appellees, to the

98

effect, that if the appellant would give them the benefit of the aforesaid agreement, so that they should become the lessees thereof, they undertook, and agreed, not to use the screws and machinery of the press, in compressing cotton, and that he accordingly relinquished his right, and they became the lessees thereof, and he became their surety for the payment of the rent.

After they had become the lessees of the press, they and appellant entered into an agreement in writing, to the effect that your orator should surrender to them the entire and undivided control of the wharf in front of the Independent Press, and also 150 feet of new wharves, adjoining the Independent Press, with the exception of 200 feet at the north end, which was reserved for the purpose of shipping compressed cotton, the entire inward receipts of said wharves, to be appropriated to the appellees, and the inward wharfage not to exceed five cents per bale. In consideration thereof, the appellees agreed to use Hitchcock's press as a warehouse, and in no instance to use it for the purpose of compressing cotton, reserving to appellant the privilege of using the screws of the press, for the purpose of pressing cotton, in the event of the breaking of his own press, he paying to them $500 for the use of the screw. It was further agreed, that the terms of the attachment of Hichcock's press to the Independent press, should be the same as those agreed on between T. Holland and J. Alsobrook, of the Factor's press, for the business of 1844, 1845, and to be determined upon by them. The agreement is made an exhibit to the bill.

That in pursuance of said agreement, he surrendered to the appellees the wharves before mentioned, and has in all things performed, and is ready and willing to perform his part of the contract—that confiding in their promise, he made contracts, and arrangements with divers persons, whereby he undertook that Hitchcock's press should not be used for the purpose of compressing cotton, and which would be violated if the press is now used for that purpose.

That the appellees, in violation of their agreement, are now fitting up the press, and preparing to compress cotton, and threaten to use, and will use the press for that purpose, unless restrained—that they are insolvent, and irresponsible,

and unable to pay such damages as might be recovered of them. The prayer of the bill, is for an injunction, which was granted by a circuit judge.

The defendants, by their answer, admit, they signed the instrument set out in the bill, but insist it was a mere memorandum, and part only of an agreement, had between the parties. That previous and subsequent to its being signed, there were many negotiations, promises, representations, &c. all of which were component parts of the contract. Deny that any favor was conferred on them by Casey, in letting them take his contract for Hitchcock's press; that he was unable to comply, &c.

That he strenuously urged their entering into the agreement above set forth, representing that he had received over 100,000 bales of cotton at the Independent press, the preceding year. That he had made agreements with planters, and would make such with others, which would increase the quantity, and compensate them for not running their screw —that the wharfage would have been worth to them about $5,000, and the storage and charges on such cotton about forty cents per bale.

That the most of the cotton, which came over said wharves and are to come, came without specific instructions from the planters, as to where it was to be stored, and that when landed on said wharves, and whenever it came without such instructions, the factor, or planter, ordered it to be stored wherever he thought proper—that they obtained but one-third of the cotton to be stored with them, and the Independent and other presses the residue.

That to induce them to enter into the contract, he made many representations of the advantages to accrue to them from his efforts, and influence, and persuaded them, that by making an arrangement against the other presses and warehouses of the city, they would jointly be enabled to control a large portion of the crop. That at the time, the sympathies and feelings of the planting interest was committed to sustain his enterprise, as it was an effort to break down a combination and monopoly of the upper presses, and that circulars had been addressed to the planters, and agreements made with

them, that a uniform tariff of rates should be established not exceeding certain charges.

That by reason of his subsequently joining said combination, and falsifying his contracts with the planters, their sympathies were turned against him—that relying on his good faith, and the promises and inducements held out, they signed the agreement, but have since discovered they were grossly and fraudulently imposed on—that he has not kept his promises, but has himself joined the " combination up town," the interest of which was directly opposed to that of respondents—that they are informed he has permitted cottons which were ordered to his press, the wharfage of which would go to respondents, to be landed on the upper wharves, thereby also depriving them of the storage, and instead of resisting the monopoly, has become a party to it ; and they are informed, and believe, he has sold the press power of respondents to the combination for $2500 or $3000, in opposition to the spirit and design of the contract. That he has acted in bad faith, and the contract was procured by deceit—that he refused to comply with his stipulations, and they notified him they considered the same as annulled.

That by said contract it was stipulated, that " the terms of attachment" between Hitchcock's and the Independent press, should be the same as existed between the Factors' press and Holland's warehouse. That they have been informed by one of the parties, that the press should pay the ordinary charge for " arranging," to the warehouse, amounting to three cents per bale—that the charge is reasonable, and a bare compensation for the labor—that in defiance of his contract, Casey has refused to pay this charge, and denies his liability, and the respondents are unable to collect it—that Casey is embarrassed, and it could not be collected by law, from his insolvency.

That the probable amount of profits they would derive from the screws, for the rest of the year is $12,000, and that they estimate the loss already sustained by them, from Casey's bad faith, at $10,000—that up to the time of filing the bill, they have kept their contract with complainant, and considering it as annulled, they assumed the right to run the screws, &c. &c.

Casey v. Holmes, Bott and Earle.

For so much of the testimony as is important, see the opinion of the court.

The chancellor, by his decree, considered that an intention merely to violate the contract, did not justify the interposition of chancery. Further, that a material part of the contract was omitted in the bill, and the bill therefore defective, and therefore, without an examination of the answer, and proofs, dismissed the bill. This is now assigned as error.

CAMPBELL and JONES, for plaintiff in error.

1. The contract between the parties, on which the bill is founded, was in writing, and parol evidence is inadmissible to vary or add to its terms, or even to explain any *patent* ambiguity.

2. If there had been fraud in procuring the execution of the contract, that might be established by parol. But the proof does not show any such fraud.

3. The contract on the part of the defendant, was a covenant for a valuable consideration, *not* to carry on a *particular* business in a *particular place*, for a limited *time*. Such a contract is *valid*, and not against public policy. [1 Story's Eq. 289, § 292, and cases cited in note ; Mitchell v. Reynolds, 1 P. Wms. 181 ; 3 Brown Parl. Cases, 349 ; 6 Adol. & Ellis, 959, (33 Eng. C. L. R. 254.)

4. In such a case, equity will decree a specific performance. [2 Story's Eq. 22, 29, especially § 722, a. ; Drewry on Inj. 251, (36 Law Lib. 172 ;) Kemble v. Kean, 6 Simons, 333, (9 Con. Ch. Rep. 296.)

5. The whole substance of the contract was, to give the defendants the use of the plaintiffs' wharves, and to restrain the defendant from compressing cotton with Hitchcock's press, during the business season of 1845-6.

In going after the terms of attachment of Holland's warehouse to the Factor's Press, the chancellor quit the material and important point. He dropped the substance to catch at the shadow.

6. The ground on which the chancellor predicated his decree was, that there is no breach of the defendant's covenant alledged. It appears from the answers of the defendants that they had in fact *literally* broken their covenant, by com-

pressing *one* bale of cotton *before* the bill was filed. But from the nature of the case, there could not be a substantial, specific performance, without restraining the defendants from doing the acts. It is submitted that in such a case, it is necessarily sufficient, a *declared intention* and acts of *preparation* to break their agreement. This is distinctly alledged in the bill, and admitted in the answer.

Fox, contra.

This bill cannot be sustained. As a general rule the court will not interfere, unless the contract relates to the realty. Exceptions are allowed only in special cases, and always in guarded terms. No good precedent can be cited where the court interfered by anticipation to prevent the violation of an agreement merely personal, and sounding in damages before there has been a default. To prevent permanent and irreparable injury to the freehold, where the danger is imminent, the aid of the court may probably be invoked, but even to this extent the jurisdiction is not settled, and in no other case does it seem to have been claimed.

An examination of the case of Martin v. Watkin, 2 P. Wms. 266, will show that it does not sustain the case of the appellant. A mere suggestion of apprehended injury, is insufficient to call into operation the extraordinary powers of the court. [Logman v. Califord, 3 Anss. 645 ; Long v. Brown, 4 Ala. 622.]

The bill is obnoxious to another fatal objection. The agreement as set out is incomplete and uncertain in its terms, as it adopts in general language terms said to exist between other parties. It is not shown what these terms are, either by the agreement itself or by the bill, but they are evidently material parts of the agreement. The rule is, that the agreement must be set out with a sufficient degree of certainty, that the court can see from inspecting it, the decree it should render. [Smith v. Burnham, 3 Sumner, 435 ; Colson v. Thompson, 2 Wh. 336 ; 2 Story's Eq. §§ 751, 764, 767 ; German v. Macklin, 6 Paige, 288 ; Brodie v. St. Paul, 1 Ves. jr. 333 ; Walpole v. Oxford, 3 Ib. 419 ; Hamitt v. Yielding, 3 Sch. & Lef. 548 ; Lindsay v. Lynch, Ib. 7 ; Goodwin v. Lyon 4 P. 297 ; Lewis v. Love, 1 Ala. 335.]

The *whole* contract must be before the court.  The court will not decree for a part unless it can decree for the whole. [Kemble v. Kean, 6 Simons, 333 ; Kimberly v. Jennings, Ib. 640 ; Drewry on Inj. 36 Law. Lib. 175 ; Att'y Gen. v. Day, 1 Ves. sr. 217.]

The court will not enforce a contract when it does not know the terms composing it, but refers for some of its terms to other papers which are not produced, or to the determination of other parties.   [Kennedy v. Lee, 3 Meri. 440 ; Wilks v. Davis, Ib. 507 ; Milnes v. Gery, 14 Ves. 400.]

The agreement set out is against public policy, and in restraint of trade.   A covenant not to carry on a particular trade within a reasonable distance of another carrying on the same trade may be good, but whatever may be the form of the agreement, if it amounts to an absolute prohibition, it cannot be supported.   The effect of it here, is to create a monopoly. [Story on Const. § 190.]

But supposing the bill to be good, the complainant is not entitled to his decree—1.  Because he alledges insolvency of the defendants as the gravamen of the complaint, and this is disproved.

2.  The testimony establishes that the conduct of the complainant is obnoxious to a charge of tardiness, unfairness, and general bad faith, and that he has in fact broken his part of the agreement.  [2 Story's Eq. §§ 769, 770; Jones v. Roberts, 3 H. & M. 436 ; 3 Bibb, 298 ; 4 Munf. 273, 288 ; Hepburn v. Dunlap, 1 Wh. 179 ; Thompson v. Todd, 1 Pet. C. C. Rep. 380 ; 1 Mad. Ch. 405, *et seq.*; Cathcart v. Robinson, 5 Pet. 264.]

Slight circumstances of unfairness misrepresentation, concealment, mistake, or the omission of any one of the terms of the real agreement are sufficient to defeat the relief sought. [14 Ves. 519; 2 Story Eq. § 770; Beck v. Simmons, 7 Ala. 71 ; Cadman v. Homan, 18 Ves. 10.]

And to show these circumstances, parol evidence is admissible.   [2 Mad. Ch. 321; Gorman v. Salsbury, 1 Vern. 240 ; 1 Ves. & B. 527 ; 4 Pet. 328 ; Gould v. Womack, 2. Ala. 83; 2 Swans. 244.]

Complainant's violation of the spirit and letter of this agree-

ment, authorized defendants to abandon it. [Martin v. Chap-
man, 6 P. 344.]

ORMOND, J.—We agree with the chancellor, that there is
nothing in this contract, which would prevent the interfe-
rence of a court of chancery by injunction, if a proper case
is made out by the bill.    The complainant and the defendants
were proprietors of adjacent warehouses, and wharves, to
each of which was attached an expensive apparatus for com-
pressing bales of cotton, by steam power, and upon the con-
sideration, that the complainant would allow the defendants
the use of the principal part of his wharf, and abstain from re-
ceiving the wharfage on the cotton landed there, the defend-
ants agreed not to compress cotton at their screw, during the
business season.

This contract has been partially executed between the
parties, and the defendants have for some months had the
benefit of it.    The benefit which was to accrue to the com-
plainants, was of a negative character, as it respected the ac-
tion of the defendants; they were to abstain from the use of
their screw.    They now threaten to violate the contract, by
the use of their screw and press, in compressing cotton. The
bill charges that they are making preparations to break their
contract, and threaten to use, and will use the press and
screw, in compressing cotton, unless restrained by an injunc-
tion out of chancery.

This contract is not in restraint of trade generally, nor can
it be intended that it is for the purpose of creating a mono-
poly, and enhancing the price of compressing cotton.    It ap-
pears on its face to be a contract entered into for the mutual
benefit of the contracting parties, in which the public has no
peculiar interest.    It is also a case in which it would be dif-
ficult, if not impossible, to ascertain the damage which would
ensue to the complainant from a breach of the contract.  This
results necessarily from the nature of the undertaking of the
defendants, which is not to do certain acts.    How far, and to
what extent the doing of these acts would prejudice the oth-
er party, cannot be known, because it would be impossible
to admeasure the effect of a rival, hostile establishment, pur-
suing the same business, in the same immediate vicinity.

Casey v. Holmes, Bott and Earle.

Nor could it be known at the end of the season, how much of the cotton which would otherwise have been compressed by the complainant, had gone to this rival press; and equally difficult would it be to say, what effect such competion might not have in depressing prices, when an ally was thus suddenly converted into an enemy. It therefore, in our opinion presents a case, in which it is proper the court of chancery should interpose its preventive justice, and by enforcing the performance of the contract, prevent the commission of the wrong. It is now the established doctrine of equity, that it will interfere, and compel the performance of contracts, whenever the remedy at law is doubtful, uncertain, or inadequate, although the agreement concerns personal property alone.

Nor is it necessary that the agreement should be actually violated, it is sufficient if the danger of its violation is imminent, and actually impending. In the case of a covenant not to do a particular act, the danger could be correctly appreciated, by the language and conduct of the party—by his threats, and the preparations to do the act. All these exist in this case, as charged in the bill, and upon looking into the answer, we perceive that the defendants admit the fact, and state that they had notified the complainant, that the contract was at an end. These principles are fully illustrated in the following cases: [Mallan v. May, 11 Meeson & W. 652; Jarvis v. Peck, 10 Paige, 118; Franklin v. Tuton, 5 Madd. C. 285; Mechanics B. of Alex. v. Seton, 1 Peters, 300; Bonaparte v. The C. & A. Rail Road, 1 Baldwin, 231; Kemble v. Kean, 6 Simons, 333.]

The chancellor also held, that this contract was fatally defective on its face for uncertainty, and could not therefore be specifically enforced. The portion of the contract here referred to is in the following words: " The terms of the attachment of Hitchcock's press to the Independent press, to be the same as was agreed upon by Thomas Holland and J. Alsobrook, of the Factors' press, for the business season of 1844 and 1845, to be determined on by them." This objection goes the entire length of nullifying the contract, for certainly if it is so uncertain, that it cannot be ascertained from it, what its provisions are, it is void for that cause, and cannot be enforced, either at law or in equity. This is a conclusion, to

99

which a court would come with great reluctance, and which it would struggle against. The parties certainly affixed some meaning to the terms they employed, and in a case where the contract had been entered upon, and in part executed, and especially in a case where the party making the objection, had derived a benefit from it, the court would be satisfied with probability, where certainty was unattainable. The case of Ellis v. Burden, 1 Ala. 464, was one of real doubt and uncertainty, and yet, as the contract had been partly executed, this court did not hesitate to expound the contract, and having ascertained the probable intention of the parties, enforced a specific performance.

But the objection itself is without foundation. The "terms of the *attachment*" of the two presses, are to be the same as those of the Factors' press, the terms of which were to be determined by two persons who are named. That is certain, which may be rendered certain, and the legal effect of this clause is precisely the same as if the terms of attachment of the Factors' press had been embodied into the contract. This would be its effect, if it had not provided for the means of proving what those terms were, but it goes further, and distinctly states what shall be proof of the *terms of attachment.*

The chancellor appears to have considered, that this would be to permit a portion of the contract to be in writing, and the residue to rest in parol.

It is to be observed, that this is not a contract which is required by law to be in writing, yet even in regard to such contracts, as for example, a devise, it is well settled, that when the subject of a devise is described by reference to some extrinsic fact, parol proof of such fact may be made. The law is the same in respect to deeds, and other instruments, as held in this court in Ellis v. Burden, *supra*, and fully expounded by Sir William Grant, in Ogilvie v. Foljambe, 3 Mer. 52, and see the long train of authorities printed by Cowen & Hill, 3 vol. P. Ev. 1399. We consider it therefore clear, that the contract is not void, because it refers to the terms of another contract, existing between other parties, as one of the stipulations then agreed upon, but that proof may be made, what those terms thus referred to were, and enforced as a part of the contract.

It is further supposed, that admitting the contract to be such as can be enforced, it is not sufficiently set forth in the bill, so as to justify the court in granting the relief which is sought.

It is only necessary that the complainant should state the facts, upon which he relies, with reasonable certainty. In this case the relief prayed for grows out of the apprehended breach of a contract ; it was therefore necessary that the contract should be stated, either according to its tenor or legal effect. It is stated almost in *haec verba.* It was also necessary that he should show himself entitled to the aid of the court, by an allegation that he was not himself in default, and it is explicitly alledged, that the complainant has fulfilled and performed, and is desirous to fulfill the contract on his part ; but that the defendants threaten to break, and are making preparations to break the contract in its most essential particular ; in that part which constituted the whole inducement on the part of the complainant for entering into it. The objection is, that he has not set out in the bill, what the *terms of the attachment* of the Factors' press are. We do not consider this a matter of any moment, whatever they are, they are covered by the allegation, that he has performed, and is willing to continue to execute, the entire contract. It is not necessary in any case, that the complainant should anticipate that which is properly matter of defence. The *gravamen* of the bill is, that the defenants were about to set their press in motion. This was a violation of the contract, and if the complainant has performed the contract on his part, he is entitled to the relief he seeks, upon the face of his bill.

The defence made by the answer, is, that the complainant has not acted in good faith with them, but has broken the promises, and disregarded the inducements held out to them to enter into the contract, by which the contract has ceased to be beneficial, and they have been prevented by his acts from reaping the benefit they expected from it.

The facts narrated in the answers are, that the complainant the year previous, had established a warehouse, wharf and press, and had interested the planters owning cotton sent to Mobile, to direct their cotton to be sent to his press, by promising to reduce the rates of wharfage, &c.; and by breaking

down the combination, which had existed among the presses in the city—that he promised to continue these exertions among the planters, and thus to secure custom to the "Independent Press," the wharfage and storage of which would belong, under the contract, to the defendants. That he had failed to use his exertions with the planters, but had entered into the "combination" with the other presses of the city, by which he had encountered the disapprobation of the planters, and thereby materially diminished the quantity of cotton sent to the Independent press, and consequently affected the profits of defendants.

So far as these promises or inducements are considered as matter of contract between these parties, it is very clear they are entitled to no consideration whatever. All previous promises or inducements are merged in the written contract. It is not pretended that it was entered into by mistake, or that it is not precisely what the parties intended it should be; nor is it alledged that the defendants were induced to enter into it by the fraudulent misrepresentations of the complainant. It is true, it is alledged in the answer, "that the agreement was obtained by said deceit and unfair·practices," but the deceit here alledged consists in the supposed violation by complainant; of his promises, subsequent to the execution of the contract; and although this might constitute a breach of the contract, and be a sufficient reason for refusing relief, it would not affect·the instrument itself, with fraud. See this question fully considered in Hair and Labuzan v. La Brouse, at the present term. The instrument therefore not being void for fraud, must be its own expositor, and from it must be ascertained the relative rights, and obligations of the parties.

It is nevertheless true, that cases of this kind are appeals to the extraordinary power of the court, and that it will be refused, where the performance of the contract would be unconscientious, or where the bargain is hard and unreasonable; where, in a word, under all the circumstances of the case, it would be inequitable to enforce a performance of the contract; and in such cases the parties will be left to their legal remedy. [Gould v. Womack and wife, 2 Ala. Rep. 83.] It appears also, that a greater latitude is allowed the defendant in his

defence, than would be accorded to the plaintiff in making out his case.

But in looking into the attendant circumstances, and the conduct of the complainant, we can perceive no reason for refusing the relief. As it respects his efforts to induce planters to send their cotton to his wharves, it appears from the testimony of Mr. Salomon, that he made great exertions, visiting nearly every county in the State, which shipped cotton to Mobile, either in person or by his agents; and causing 2,000 hand-bills to be sent to planters throughout the State, to induce them to send their cotton to his press, and continued his exertions with the captains of steamboats during the winter, furnishing hands to unlade the boat, &c. &c.

The "terms of attachment," is a charge which one press or warehouse pays another, for "arranging" cotton. What these terms, or rules, were, between Holland & Alsobrook, was furnished in writing by the latter, to one of the defendants, which it appears he presented to Holland, who declined to sign it, although he admitted it was in the main correct, because, as he says in his deposition, Alsobrook and himself had not reduced their contract to writing. This paper it appears, furnished the rule by which the complainant's clerks were by him directed to govern themselves, and by which they were in fact governed. It does appear, to be sure, that there was some difference of opinion as to what the terms were, but it is not shown that the complainant did not endeavor, in good faith, to execute this part of the contract.

The principal matter relied on in the answer, and to prove which much testimony was taken, is, that the complainant contrary to his promises, paralyzed his interest with the planters, and materially affected the receipts of cotton, by joining what is called the "up town combination of presses," which he had pledged himself to "fight against."

So far as we can understand this part of the case, the facts are, that Casey had, a year or two since, erected a warehouse and press in the lower part of the city, in which quarter of the town Hitchcock's press was also situate; and to induce the planters to send their cotton to his press, had represented that the presses "up town" were combined together, and that he would reduce the rate of charges, and did so, by which means

he had done a large business in the season of 1844-5. That in November, or December, 1845, he united with the presses "up town," in a regular tariff of charges, and thus lost the sympathy and support of the planting interest.

This appears to us, to be nothing more than a scramble for the public favor, and it is evident, that if Casey had joined, what he had previously denounced as a "combination," and supported those composing it in their alledged exhorbitant demands, he would lose the public favor, which he had obtained by promising to put it down—but it is difficult to see, how this result should follow, when the "up town" presses came to terms, and adopted his rate of charges, and established it as a tariff, binding on all. It was a measure probably forced on him, by the threats of the others to reduce the charges still below his. Be the motive what it might, we can see nothing improper in it, and it was probably necessary to his own security. This arrangement was entered into and the tariff of charges published, on the third December, 1845, and during the residue of this month, the entire month of January, and nearly all February, comprising the most active portion of the business season, the defendants continued in the use, and enjoyment of the wharf of the complainant, under the contract, and enjoying its benefits. If the conduct of Casey was in violation of the inducements held out by him to persuade them to make the contract, they should have acted promptly, and abandoned it on their part. They cannot be permitted to act upon it, as subsisting, and at the same time insist that it does not bind them.

It also appears, that they successively refused $10,000, $8,000, and $6,000, at different periods after the tariff of charges was agreed upon, for the use of their wharves. These offers certainly would not have been refused, if the effect of the agreement of Casey in the general tariff, had materially impaired the value of the wharf.

We have considered this matter at some length, because it was earnestly pressed by the counsel for the defendant, although it scarcely comports with the gravity and dignity of judicial proceedings, to enter seriously upon the consideration of the merits of these squabbles for popular favor, for this at last is what it all amounts to.

Again, we have considered this matter as if it was fully proved, that these promises were made, and inducements held out by the complainant to the defendants, without which the contract would not have been made. This is, it is true, made out by the testimony of Mr. Earle, to some extent, but is as flatly denied by the witness, who was present when the contract was made, and who, at the instance of the parties drew it up. And certainly, if in any case a specific performance could be prevented by the proof of facts *dehors* the contract by the defendants, such facts must be fully proved. See the cases on this subject collected by Sugden in his Treatise on Vendors, C. 3, § 4.

Upon the entire case, we are fully satisfied, first, that this is such a contract as a court of chancery may direct the specific performance of. Secondly, that under the circumstances of this case, a specific performance should be decreed.

From this, it follows, that the decree of the chancellor must be reversed, and a decree be here rendered perpetuating the injunction.